FILED
JUN 06 2008

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| ROSALIE J. OLSON, | \* | CIV. 07-4071 |
| Plaintiff, | \* | |
| -vs- | \* | REPORT and RECOMMENDATION |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | \* | |
| Defendant. | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff seeks judicial review of the Commissioner's final decision denying her a period of disability commencing on September 24, 1998, and payment of disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act.[1] The Plaintiff has filed a Complaint and has requested the Court reverse the Commissioner's final decision denying the Plaintiff disability benefits. The matter is fully briefed and has been referred to the Magistrate Judge for a Report and Recommendation. For the reasons more fully explained below, it is respectfully recommended to the District Court that the Commissioner's Decision be AFFIRMED

---

[1] SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon her "coverage" status (calculated according to her earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.

In this case, the Plaintiff filed her application for both types of benefits at the same time (April 14, 2005). AR 46-52, 248-49. Her coverage status for SSD benefits expired on December 31, 2003. AR 261. In other words, in order to be entitled to Title II benefits, Plaintiff must prove she was disabled on or before that date. AR 12.

and the Plaintiff's Complaint be DISMISSED.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g). Judge Piersol referred this matter to the Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and a Standing Order dated November 29, 2006.

## ADMINISTRATIVE PROCEEDINGS

Plaintiff filed her application for benefits on April 14, 2005. AR 46-52, 248-49. In a form entitled "Disability Report–Adult" she filed in connection with her application (AR 92-100) Plaintiff listed the following as illnesses, injuries or conditions that limited her ability to work: "lumbar musclegrea (sic) problem; enlarged heart; web fingers; BACK PROBLEMS." (emphasis in original.) On September 22, 2005, Plaintiff filed a form entitled "Disability Report–Appeal" (AR 78-84) in which she explained that her illness, injuries or conditions had worsened since she last filled out a disability report in the following ways: "my back has gotten worse my health for my heart and my system I have to have a hysterectomy." She also claimed new physical limitations as a result of her conditions since her last disability report: "because I can't do anything for myself, my sons do everything for me and I have become very depressed." Plaintiff also claimed the following new illnesses, injuries or conditions since her last disability report: "I have had problems with high blood pressure, I have problems, with my stomach, bad periods, have to have hysterectomy." AR 78. Two months later, Plaintiff filled out another form entitled "Disability Report–Appeal" (AR 85-91) in which she claimed the pain in her back had increased, that "it takes longer to perform daily tasks, bathing, dressing putting shoes and socks on, and that she has "uncontrolable (sic) bleeding and pain."

Plaintiff's claim was denied initially on September 1, 2005 (AR 29), and on reconsideration on November 1, 2005. AR 30. She requested a hearing (AR 38-39) and one was held on September 26, 2006, before Administrative Law Judge (ALJ) the Honorable Robert Maxwell. AR 258-296. On November 2, 2006, the ALJ issued a seven page, single-spaced decision affirming the previous

denials. AR 12-18.

On December 4, 2006, Plaintiff's attorney sent a letter to the Appeals Council requesting review of the ALJ's decision. AR 7-8. The Appeals Council denied review of Plaintiff's claim on April 17, 2007. AR 4-6. Plaintiff then timely filed her Complaint in the District Court on May 17, 2007.

## FACTUAL BACKGROUND

### A.   Biographical Information

Plaintiff was born in 1956. She was forty-two on her alleged date of onset and fifty on the date of the administrative hearing. AR 42, 248. She completed the ninth grade, and although she aspires to do so, has never received her GED. AR 263. School was "very difficult" for her. *Id.* She has never been tested for a learning disability. AR 188. She divorced and lives in Pierre, South Dakota with her adult son. AR 262.

### B.   Work Experience

Plaintiff's only relevant work experience is as a housekeeper at a hotel. That work required her to clean rooms, change bedding, make beds, clean bathrooms, and vacuum. AR 105-111, 122. She quit working full-time in September, 1998.[2] She called her boss and told him her "lumbar is not working no more." AR 265. After she quit her job at the hotel, she attempted to work in a deli making sandwiches. AR 265-66. She worked only one day, however, and the next morning "couldn't even get out of bed." AR 265.

### C.   Medical Evidence
#### 1.   Orthopedic Condition

On July 20, 1998, Plaintiff sustained an injury in the laundry room at work. AR 172-77, 267. A stack of boxes fell on her. *Id.* She was briefly rendered unconscious. *Id.* She sustained injuries to her neck, shoulder, and low back which resulted in pain and spasm in the right rhomboid

---

[2]Plaintiff was not exactly sure when she quit work at the Ramkota altogether. AR 265. The medical records indicate she worked at least part-time through late October or early November, 1998. AR 128-29.

3

and lumbar paramusculature. AR 172-77, 202-03. She was hospitalized for one day. AR 172. An MRI showed a "normal" cervical spine, degenerative spondylosis in the thoracic spine and an "unremarkable" lumbar spine. AR 176. Physical exam revealed a full range of motion in all extremities. AR 173. She was discharged from the hospital with a two week prescription for Naprosyn[3] and instructions to ice her shoulder three times per day. AR 172. She was instructed to follow up in one week and to remain off work during that time. *Id.*

Plaintiff participated in six sessions of physical therapy. AR 161. She reported a steady decrease in pain, and improved mobility. *Id.* She returned to her job as a hotel housekeeper. *Id.*

Plaintiff was admitted to the hospital on August 22, 1998, complaining of low back pain after bending over at work. AR 163. Her neurological exam was relatively normal. AR 164. Her musculoskeletal exam revealed tenderness bilaterally over the paraspinal muscles in the lumbar region. Lumbar x-rays were relatively normal with the exception of slight disc space narrowing at the L5-S1 level and some degenerative changes in the thoracic spine with disc space narrowing and mild osteophyte formation. AR 166. Dr. Meyer diagnosed a muscle spasm and prescribed Naprosyn, Tylox and Flexeril.[4] Plaintiff was discharged from the hospital on August 24. Dr. Meyer instructed her to remain off work for three days. AR 162.

Plaintiff followed up with Dr. Meyer on September 2, 1998. AR 202. At that time, she was "much improved." Dr. Meyer returned her to work and discontinued her medication. *Id.* Plaintiff returned to Dr. Meyer again on September 21, 1998 with back pain since bending over at work on September 17. Dr. Meyer prescribed medication and referred her to an orthopedic surgeon (Dr. Stout).

---

[3]Naprosyn is an NSAID indicated for pain management and arthritis conditions. Www.rxlist.com

[4]Flexeril is prescribed for the relief of muscle spasm associated with acute painful musculoskeletal conditions. Www.rxlist.com. Tylox is a generic name for Oxycontin, which is prescribed for the management of moderate to severe pain. *Id.*

4

Plaintiff reported to Dr. Stout at the Orthopedic Center in Pierre, on September 24, 1998. AR 134. She again described low back pain and spasms after bending over at work. *Id.* Her physical exam was normal. *Id.* The x-ray exam of her low back revealed spur formation in the lumbar area, but was otherwise normal. *Id.* Dr. Stout noted an MRI was scheduled for the next day. *Id.* If the MRI showed nothing of consequence, Dr. Stout planned to proceed with cortisone injections in the SI joints. *Id.* Plaintiff returned to Dr. Stout on September 28th. Plaintiff apparently did not undergo the MRI because she was claustrophobic. AR 133. Dr. Stout noted "she is apparently is now under our direction as far as being off work, etc." He decided to keep her off work pending a second injection, but noted that if she tolerated it well "getting her back to work expeditiously would be helpful for her." AR 133. He also opined she may need work hardening in the future. *Id.*

When Plaintiff returned to Dr. Stout on October 12, 1998, he noted she had been on light duty but went to work only one day for a few hours. AR 132. Her straight leg raise exam was negative. Dr. Stout performed a second injection, this time on her left side. AR 131. He instructed her to remain on light duty. *Id.* He also suggested an ergonomic evaluation of her worksite and a back brace. A note in from Intracorp in Dr. Stout's record dated October 14 indicates an ergonomic evaluation of the worksite was performed on October 16. AR 130. On October 26, 1998, Plaintiff returned to Dr. Stout. *Id.* She indicated her symptoms were "much less" and she was working fewer days, cleaning fewer rooms. She had no pain complaints. Dr. Stout recommended a gradual return to work. *Id.* He recommended a maximum five day work week. AR 129.

Plaintiff next saw Dr. Stout in January, 1999. She told him she quit her job at the Ramkota two months earlier. AR 128. Her physical exam during that visit was normal except for discomfort in the SI joints and low back during palpation, flexion and extension. *Id.* Dr. Stout recommended Plaintiff either find a sedentary job or more appropriately see a physiatrist so she could get back to her pre-injury status and return to her previous work. AR 127. Plaintiff received injections to the SI joints in April, 1999. AR 126. At that time, her physician recommended work hardening and increasing her activity. AR 125.

Plaintiff returned to Dr. Stout in April, 2004. AR 190. She described back pain which Dr. Stout referenced as "fairly global." She told Dr. Stout she was "looking for disability." *Id.*[5] Her straight leg raising test was negative and deep tendon reflexes were normal. *Id.* Rotation of her hips, however, caused pain. X-rays of the lumbar spine showed well maintained disc space but spurs at the L3-4 and L4-5. There was no spondylosis or spondylisthesis. The films also showed normal hip joints. AR 190. Dr. Stout decided to order an MRI of the low back. *Id.* The MRI was completed on April 20, 2004. The MRI revealed degenerative changes of Plaintiff's spine, but no sign of nerve impingement which could be causing chronic pain. AR 189.

### 2.   Cardiac Condition/High Blood Pressure

Plaintiff had open heart surgery to repair a ventricular septal defect when she was two years old. AR 138, 150, 173, 184, 187, 206, 214, 216. In May, 1998 Plaintiff complained of chest pain to her family physician. AR 206. Her family physician referred her to a cardiologist (Dr. Moench). AR 205. Both Dr. Meyer and Dr. Moench diagnosed a systolic heart murmur. AR 216. An echocardiogram was performed and interpreted by Dr. Moench. AR 217. After his exam Dr. Moench did not believe Plaintiff's chest pain was ischemic. *Id.* He also did not believe her heart murmur was hemodynamically significant. *Id.* He recommended further testing, which was performed on May 15, 1998. AR 218-19. The tests were relatively normal. AR 218.

Plaintiff was admitted to the emergency room at St. Mary's Hospital in Pierre, South Dakota in June, 2000. She reported experiencing chest pain while watching "Who Wants to Be A Millionaire." *Id.* After testing she was released and instructed to take nonsteroidals and Tylenol. AR 150-51. Plaintiff's family doctor noted she did have high blood pressure and he prescribed Atenolol.[6] AR 195.

### 3.   Other Conditions

Plaintiff's third and fourth fingers on her left hand were webbed at birth. AR 186,

---

[5]Plaintiff visited Dr. Hoffsten in March, 2004, with the same request. AR 191.

[6]Atenolol is indicated for the treatment of hypertension. Www.rxlist.com.

6

271, 273. The fingers were surgically separated when Plaintiff was twelve years old. *Id.* As noted above, Plaintiff listed menstrual problems on the various disability forms as contributing to her disabling condition, but this condition was not discussed at the hearing, by the ALJ in his decision, or by either party in briefing. It is therefore considered waived.

### D. Dr. Hoffsten- DDS Non-Treating Physician Examination

Plaintiff was examined by Dr. P.E. Hoffsten on August 15, 2005, at the request of Disability Determination Services. AR 186-188. Plaintiff reported four areas of concern: back pain, webbed fingers, a heart condition, and high blood pressure.

Dr. Hoffsten reviewed Plaintiff's records. He found no specific organic lesion to explain her back pain complaints. AR 186. He discussed her webbed fingers, and noted the surgical procedure to separate them when she was an adolescent. *Id.* Plaintiff claimed residual stiffness which precluded normal function, but Dr. Hoffsten's exam showed normal coordination, ability to make a fist and to straighten her fingers. *Id.* Dr. Hoffsten described Plaintiff's residual heart defect as a high flow, low volume leak. AR 187. He noted the cardiologist's determination that this problem had "no clinical consequence." *Id.* Her cardiac function and output is within normal limits. *Id.* Finally, although she has high blood pressure it is treated with medication and upon her visits to physicians is usually in the "normal" range. AR 187. He noted no pulmonary symptoms or neurologic abnormalities. *Id.*

On physical exam, Dr. Hoffsten noted no evidence of an inflammatory joint condition. Plaintiff exhibited no limitation in her range of motion in any of her limbs, no muscle atrophy, no muscle weakness, and no problems with coordination or fine or gross muscle coordination. AR 187-88. Although Plaintiff complained of recurrent chest pain, Dr. Hoffsten's review of her medical records and extensive work-up (stress test, echocardiogram, transesophageal electrocardiogram, chest films) revealed no organic cause .

Dr. Hoffsten ordered x-rays of Plaintiff's cervical and lumbar spine. They revealed a

calcification at the C6-7 level and a spina bifida at the sacrum which Dr. Hoffsten described as "of no clinical significance." AR 188. Based on his review of the records and his physical examination, Dr. Hoffsten stated Plaintiff's work restrictions would be "not seem to be very different than that of the general public" although he expressed some reservations about her academic capabilities. *Id.* He could not find any organic basis for her claimed ongoing back or chest pain. *Id.*

### E.   Hearing Testimony

The Plaintiff and her friend/neighbor (Becky Headman) testified at the hearing which was held on September 26, 2006 in Huron, South Dakota. Plaintiff was represented by counsel during the hearing. AR 258. A vocational expert (William Tucker) was present at the hearing but did not testify.

Plaintiff was fifty years old as of the date of the hearing . AR 262. She was divorced, but living with one of her grown sons. She completed the ninth grade, then dropped out of school because it was too difficult for her. AR 263. She still hopes to obtain her GED. *Id.* Her last full-time employment was as a maid at the Pierre Ramkota Hotel. AR 264. She could not remember for sure when she quit working. She quit that job because her "lumbar muscle got messed up." *Id.* She does not believe she could return to that job because she says she can't even make her own bed at home. AR 266. She testified that he son Shane "does pretty much everything for me." *Id.* About the only thing she does is heat up soup in the microwave.

Plaintiff did have a worker's compensation claim against the Ramkota as a result of her work-related accident in the laundry room. AR 267. She also sued the company who stacked the boxes that fell on her. *Id.* She had to reimburse the worker's compensation carrier, however, from the proceeds of the civil suit. *Id.* She has had no income whatsoever since that matter was resolved. *Id.*

Plaintiff testified that "every part" of her body is in pain. AR 268. When she leans down she can hardly get back up because of her lumbar muscle. *Id.* She also has days that she can hardly turn

her neck because of a 1995 car accident she was involved in which left her car looking "like an accordion."[7] Plaintiff initially said she should have had surgery but didn't because she did not have any money. AR 269. She later said that no doctor had ever actually recommended surgery for any level of her spine. AR 270. She explained that Dr. Stout gave her cortisone injections but would not give her anymore because "they could cripple you for life." *Id.* She gets sharp pains in her neck and headaches that cause nausea which almost makes her vomit. *Id.* She has this type of pain every day. She also has tingling and numbness in her arms and hands. AR 271.

Plaintiff also testified that she has arthritis in her hands. *Id.* No physician has ever told her she has arthritis but she knows she has it because she can feel it. AR 272. She is left-handed and her left hand swells up and hurts. *Id.* She has not gone to the doctor about her arthritis, she just thought it happened because of the car accident and the lumbar muscle. *Id.* Plaintiff's fine motor skills such as typing are not very good. AR 277. She always has low back pain which she described as "excruciating." *Id.* She never has a day without neck or low back pain. AR 278. Her legs are numb and tingling. AR 272. She had shots in her low back, but they only provided short-term relief. AR 273-74. Plaintiff believes her symptoms have gotten worse in the last two or three years.[8] She used to be capable of walking three miles per day and now she can barely walk up the sidewalk. AR 278. Her average pain level is 8/10 and four or five days a week it is 10/10. Her only pain medication is over-the-counter medication such as Tylenol and Advil. AR 279.

Plaintiff estimated she can stand for fifteen or twenty minutes before she needs to sit down. AR 280. She can sit approximately the same amount of time. AR 280. The farthest she can walk is between trailers in the trailer court where she lives. *Id.* She must use two hands to lift a gallon of milk. AR 281. It is hard for her to lift her arms to dress herself. AR 282. She sleeps on the couch or in a chair because getting in and out of bed causes to much pain. AR 282. She can't

---

[7]A few of the medical notes in the administrative record make reference to this automobile accident, but the medical records pertaining to this automobile accident are not included in the file.

[8]Her testimony was given on September 26, 2006.

9

remember the last time she slept through the night. AR 283. Her typical day consists of showering, dressing, eating, and watching t.v. Her son does all of the cooking and household chores. AR 284. She used to play bingo and go fishing and bicycle riding. Now she doesn't do anything. AR 285. If she goes shopping her son goes with her. AR 286. So far she does not use a cane or walker but she is sure that she will need to in the future. *Id.* She gets out of breath when she uses the stairs. AR 287. She has a license and can drive, but she doesn't like to because it bothers her lumbar muscle. AR 289.

At the hearing, Plaintiff explained she needed to receive further testing from her cardiologist, Dr. Moench. AR 274. She had recently been having trouble breathing and feeling like she was going to pass out. AR 275. Her heart feels like it is going to beat out of her chest. *Id.* These symptoms began two weeks before the administrative hearing. *Id.* Plaintiff testified that for a period of time she did not take her blood pressure medication because of financial problems, but she currently takes it on a daily basis. AR 277.

Plaintiff's friend Becky Headman also testified at the administrative hearing. AR 290. She has known Plaintiff for seven years. *Id.* She drove Plaintiff to the hearing in Huron. AR 294. She thought Plaintiff's back was hurting during the trip because Plaintiff was shifting around in the car. *Id.* She observed that Plaintiff's condition had worsened in the past three years. They used to walk together and Plaintiff does not do that much anymore. AR 291. They shop together at Wal-Mart, but Plaintiff has to sit down after a while because her back is sore. *Id.* Ms. Headman has a one and one-half year old toddler. Plaintiff cannot pick him up because it hurts her back. AR 292. She believes Plaintiff tries to do things she physically should not be doing. AR 292. Plaintiff has occasionally asked Ms. Headman for assistance with physical tasks around the house, but Plaintiff usually waits for her son Shane to get home if she needs help. AR 292-93. Ms. Headman believed Plaintiff's condition had worsened in the past three years. AR 293.

F.  **Third Party Statement–Norace Olson**

The record contains a written statement from Plaintiff's ex-husband, Norace Olson. AR 70-77. He explained that before her injury, Plaintiff could cook, clean, work at a job, and was more outgoing. AR 71. Now her son cooks for her and helps her all the time. AR 72. She has back and leg pain if she stands any length of time. AR 73. She can shop for fifteen minutes. *Id.* She sits at home and does crossword puzzles. AR 74. Her life has changed since her injury because she "don't do anything." AR 75. In his opinion she should use a cane or walker. AR 76. In the "remarks" section Mr. Olson wrote: "My ex-wife has become disabled. She is a completely miserable irritable person. Always in pain depressed. Was a very outgoing person. Never sick like she is now. It's hard for her to do anything never to be with anybody."

## DISCUSSION

### A.  Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Klug v. Weinberger*, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence of substantial evidence supporting his decision." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted). In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. *Woolf*, 3 F.3d at 1213. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. Id. If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." *Mittlestedt v. Apfel*, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

11

The court must also review the decision by the ALJ to determine if an error of law has been committed. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. *Walker v. Apfel*, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. *Smith*, 982 F.2d at 311.

### B.   The Disability Determination and The Five Step Procedure

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511. The ALJ applies a five step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. *Bartlett v. Heckler*, 777 F.2d 1318, 1319 (8th Cir. 1985). The five steps are as follows:

> **Step One:** Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.
>
> **Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).
>
> **Step Three:** Determine whether any of the severe impairments identified in Step

12

Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. *Bartlett v. Heckler*, 777 F.2d 1318, 1320 at n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. *Heckler v. Campbell*, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

### C.     Burden of Proof

The Plaintiff bears the burden of proof at Steps One through Four of the Five Step Inquiry. *Barrett v. Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994); *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000); 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at Step Five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting at Step Five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

### D.     The ALJ's Decision

The ALJ issued a seven page, single-spaced decision on November 2, 2006. The ALJ's decision discussed steps one through two of the above five-step procedure. Because he determined

Ms. Olson does not have an impairment or a combination of impairments that has (or is expected to) significantly limit her ability to perform basic work-related activities for 12 consecutive months, he did not proceed to step three of the five-step procedure.

### E.     The Parties' Positions

Ms. Olson asserts the ALJ erred by finding her not disabled within the meaning of the Social Security Act. She asserts the ALJ erred in two ways: (1) by concluding Plaintiff's low back pain and heart-related illnesses do not constitute severe impairments; and (2) by failing to enter findings at steps three, four and five. The Commissioner asserts his decision is supported by substantial evidence on the record, is free of legal error, and should be affirmed.

### F.     Analysis

Ms. Olson asserts the ALJ made two mistakes: (1) by concluding Plaintiff's low back pain and heart-related illnesses do not constitute severe impairments; and (2) by failing to enter findings at steps three, four and five. These assertions will be examined in turn.

#### 1.     The Step Two Finding

At step two, the ALJ found Plaintiff had the following medically determinable impairments:

> complaints of low back pain over many years with evidence of only mild spondylosis of the lower lumbar spine from L3 to S1; a history of surgical repair of a septal defect of the heart at age 2 with an AV fistula accounting for a heart murmur, trace valve insufficiency with mild cardiomegaly, and hypertension treated with Atenolol, and a history of congenital webbed fingers on the left hand between the third and fourth digits, surgically repaired at the age of 12.

The ALJ concluded, however, that Plaintiff

> does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) her ability to perform basic work-related activities for 12 consecutive months. Therefore, the claimant does not have a severe impairment or combination of impairments . . . Testimony of the Claimant as to the degree of pain and functional limitation she experiences is found highly exaggerated, generally not credible, and not substantially supported by medical evidence and opinion in the record. Observations by Claimant's friend are accepted as sincere, but

do not alter the findings in this case.

AR 14-15.

A denial of benefits at step two of the analysis is appropriate only when an impairment or combination of impairments would have no more than a minimal effect on a claimant's ability to work. *Nguyen v. Chater*, 75 F.3d 429, 431 (8th Cir. 1996). A step two denial is justified only for claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account. *Id.* In order to make this determination, it is usually necessary to evaluate the credibility of the Claimant's subjective pain complaints. *Id.*

### A.     Credibility Determination

This analysis must begin with the principle that the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). "When an ALJ reviews a claimant's subjective allegations of pain and determines whether the claimant and his testimony are credible, the ALJ must examine the factors listed in *Polaski* and apply those factors to the individual." *Reynolds v. Chater*, 82 F.3d 254, 258 (8th Cir. 1996). *See also Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3). In this case, the ALJ's lengthy analysis applies some of the *Polaski* factors and explains how they apply to Plaintiff. The ALJ is not required to "explicitly discuss *each Polaski* factor in a methodical fashion" but rather it is sufficient if he "acknowledge[s] and consider[s] those factors before discounting [the claimant's] subjective complaints of pain." *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996) (emphasis added).

The appropriate factors to be considered when evaluating whether a claimant's subjective complaints are consistent with the evidence as a whole are: (1) the objective medical evidence; (2) the claimant's daily activities; (3) the duration, frequency and intensity of pain; (3) dosage and effectiveness of medication; (4) precipitating and aggravating factors; (5) functional restrictions; (6)

15

the claimant's prior work history; (7) observations by third parties; (8) diagnosis by treating and examining physicians; (9) claimant's complaints to treating physicians. *See Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001); *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993).

The ALJ did not explicitly cite *Polaski* but he did cite 20 C.F.R. § 404.1529 and the relevant factors in determining the credibility of Ms. Olson's pain complaints. For example, the ALJ noted the Plaintiff's somewhat inconsistent testimony regarding her pain levels. AR 15. He recognized that she claimed to have never been the same since her 1995 car accident, but had successfully worked full-time after that date. AR 16. She claimed she could not have needed surgery because she did not have insurance, but admitted no physician ever told her she needed surgery. AR 16.

The ALJ also noted that Plaintiff reported improvement in her back pain and in her mobility after physical therapy in 1998. Her treating physician at that time (Dr. Stout) did not restrict her from working, but only restricted her from working more than five days in a row. AR 17. Her clinical findings were relatively normal. *Id.* Dr. Stout did not recommend that she remain off work, but instead recommended that she either obtain a sedentary job or work with a physiatrist to regain her full ability to work as a hotel maid. *Id.* When Plaintiff returned to Dr. Stout in 2004 for assistance in obtaining disability, he opined that there was no sign of nerve impingement that would cause a chronic pain syndrome for her. AR 17.

The ALJ also noted that Plaintiff's minimal use of pain medication (strictly over-the-counter Tylenol and Advil) is inconsistent with her claims of constant disabling pain. The objective test results for her spinal condition and her heart condition failed to reveal organic impairments of any consequence. AR 17. Likewise, there is nothing in the medical records to support her claim of an arthritic condition in her hands or upper extremities. AR 18.

The ALJ's credibility findings are supported by good reasons and substantial evidence. They will not, therefore, be disturbed by this Court. *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999). The ALJ therefore properly rejected the Plaintiff's subjective pain complaints and self-imposed

restrictions. The ALJ properly considered but rejected Ms. Headman's testimony as well. *See Ostronski v. Chater* 94 F.3d 413, 419 (8th Cir. 1996) (lay witness testimony which merely corroborates claimant's testimony but which is inconsistent with medical evidence need not be given controlling weight). The ALJ was not required to evaluate Ms. Headman's credibility separately in order to determine it was not entitled to great weight. *Id.* [9]

### B. Physician Opinion

No physician other than Dr. Hoffsten offered any opinion on Plaintiff's current physical abilities. Dr. Hoffsten opined that Plaintiff's medically determinable impairments essentially do not affect her ability to work at all. AR 188. Dr. Hoffsten was a consulting examining physician. While consulting physician opinions are not usually given controlling weight, in this instance controlling weight was justified because Dr. Hoffsten's opinion was well supported by the other medical evidence, including the most recent notes from Plaintiff's treating physician, Dr. Stout. While the opinion of a non-examining consulting physician *standing alone* does not constitute substantial evidence, when the ALJ relies on the opinion as one part of the record which as a whole supports his findings, it is sufficient. *Harvey v. Barhnart*, 368 F.3d 1013, 1016 (8th Cir. 2004). *See also, Anderson v. Barnhart*, 344 F.3d 809, 812-13 (8th Cir. 2003) (generally consulting physician opinion does not constitute substantial evidence but there are two exceptions: (1) where the consulting assessment is supported by better or more thorough medical evidence; (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions). In this instance, the first exception applies. Dr. Hoffsten explained that his opinion was consistent with Plaintiff's treating physicians, who could not find any organic lesion to cause chronic pain in her back (Dr. Stout's report of April 2004) or any organic reason for her chest pain (Dr. Moench's reports dated May 7 & 15, 1998).

For all the reasons explained above, the ALJ's finding that Plaintiff does not have an

---

[9]For this same reason the ALJ did not err by failing to give controlling weight to the written statement of Norace Olson, even though it should have been considered under 20 C.F.R. § 404.1512(b)(3).

impairment or combination of impairments which are severe at step two of the disability analysis is supported by substantial evidence in the record.

### 2. Failure to Enter Findings at Steps Three, Four and Five.

Ms. Olson also asserts the ALJ erred by failing to enter findings at steps three, four and five. The ALJ found that Plaintiff was not disabled at step two because she did not have a "severe" impairment or combination of impairments. That finding is supported by substantial evidence. Accordingly, the ALJ was not required to consider her claim under subsequent steps. *See Bartlett v. Heckler*, 777 F.2d 1318, 1319 (8th Cir. 1985).

## CONCLUSION

For the reasons explained above, it is respectfully recommended that the Commissioner's denial of benefits be AFFIRMED, and the Plaintiff's Complaint be DISMISSED, with prejudice and on the merits.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).
Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated this 6th day of June, 2008.

BY THE COURT:

_____
John E. Simko
United States Magistrate Judge